### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| H. Blair Hahn, Esquire (Fed. I.D. No. 5717)<br>James L. Ward, Jr. Esquire (Fed. I.D. No. 6956)<br>RICHARDSON PATRICK<br>WESTBROOK & BRICKMAN, LLC<br>1037 Chuck Dawley Boulevard, Building A<br>Mt. Pleasant, SC 29464<br>(843) 727-6500<br><br>Elizabeth J. Cabraser (CA State Bar No. 083151)<br>Kent L. Klaudt (CA State Bar No. 183903)<br>LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP<br>Embarcadero Center West<br>275 Battery Street, 29th Floor<br>San Francisco, CA  94111-3339<br>Telephone:  (415) 956-1000<br>Facsimile:  (415) 956-1008<br><br>See additional counsel on signature page<br><br>*Attorneys for Plaintiff*<br><br>PAULA MINGER,<br><br>         Plaintiff,<br><br>v.<br><br>BAUSCH & LOMB, INC.,<br><br>         Defendant. | Civil Action No.  2:09-2241-DCN<br><br><br><br>**<u>CIVIL ACTION COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

PLAINTIFF, PAULA MINGER, by and through her counsel, LIEFF,

CABRASER, HEIMANN & BERNSTEIN, LLP and ROBINSON CALCAGNIE &

ROBINSON, P.C., bring this civil action against Defendant BAUSCH & LOMB, INC.

(hereinafter "Defendant") and alleges, upon personal knowledge as well as upon information and

belief, as follows:

CIVIL COMPLAINT

## I.     PARTIES

1.     This is an action for damages arising from Defendant Bausch & Lomb, Inc.'s design, manufacture, inspection, packaging, sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe ophthalmic product ReNu® with MoistureLoc®, a contact lens storage and cleaning solution sold by Defendant Bausch & Lomb, Inc. throughout the United States and worldwide.

2.     Plaintiff PAULA MINGER  is an adult citizen and resident of the State of California.

3.     Defendant BAUSCH & LOMB, INC. ("Bausch & Lomb" or "Defendant") is a Delaware corporation with its headquarters and principal place of business in Rochester, New York.

4.     At all relevant times, Bausch & Lomb marketed and sold its product ReNu® with MoistureLoc® (hereinafter "ReNu® with MoistureLoc®" or "ReNu" or the "product"), throughout the United States and in California, where Plaintiff PAULA MINGER purchased and used it.

5.     At all relevant times, Bausch & Lomb and/or its predecessors were engaged in, and made all decisions regarding, the business of researching, designing, testing, manufacturing, inspecting, packaging, marketing, distributing, promoting, advertising, and selling ReNu® with MoistureLoc® from their headquarters in Rochester, New York.

6.     During all relevant times, Defendant sold its ReNu® with MoistureLoc® throughout the United States and worldwide.

## II.     JURISDICTION AND VENUE

7.     This is an action for damages which exceeds one hundred and fifty thousand dollars ($150,000.00).  Plaintiff alleges that the amount of damages that she sustained, excluding attorneys' fees and costs, will exceed $150,000.00.

8.     There is complete diversity of citizenship between Plaintiff and Defendant.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. §

1332 (diversity jurisdiction) because the amount in controversy exceeds $150,000.00, and because there is complete diversity of citizenship between the parties.

9.      Venue is proper in this District pursuant because Defendant did business regularly in this District, sold its products in this District and made a considerable profit from the sale of those products in this District as well as throughout the United States.

## III.    FACTUAL BACKGROUND

### A.    Facts Regarding ReNu® with MoistureLoc®

10.      ReNu® with MoistureLoc® is an ophthalmic product used for the cleaning and storage of soft contact lenses.  It was marketed as a "sterile" product, and Bausch & Lomb claimed that the product, "provides sustained comfort, removes protein daily, cleans, rinses, disinfects, and stores."

11.      At all times relevant, Bausch & Lomb manufactured ReNu® with MoistureLoc® at its manufacturing facility in Greenville, South Carolina.

12.      ReNu® with MoistureLoc® was defective and unreasonably dangerous because its use can, and did, cause the user to develop a fungal infection of the eye known as fusarium keratitis.  Fusarium is a species of fungus, and is not a proper or intended ingredient of the product.

13.      Fusarium keratitis infections of the eye often cause severe and permanent vision loss and may, in certain patients, require corneal transplants.

14.      Clusters of fusarium keratitis eye infection cases associated with the use of Bausch & Lomb's ReNu® with MoistureLoc® product were reported in November, 2005, if not earlier, in several parts of Asia, including Singapore and Hong Kong.  ReNu® with MoistureLoc®, manufactured at the Greenville, South Carolina facility, was sold by Defendant in those regions of Asia.

15.      According to the Singapore Ministry of Health, a comprehensive case-control study was undertaken in February and March, 2006, to investigate risk factors for the dramatic spike in fungal corneal infections there.  The study found a strong association between

the reported corneal infections and the use of Bausch & Lomb ReNu® brand contact lens solution.

16.      This association remained strong even after taking into account socio-demographic, lens hygiene, and environmental factors.  The findings are also consistent with recent observations in the United States and Hong Kong.

17.      As of April 9, 2006, the Centers for Disease Control ("CDC") was investigating 109 cases of fusarium keratitis in multiple states in the United States.  Of the thirty patients for whom complete data were available, twenty-eight (93%) reported wearing soft contact lens.  Of these, 26 (93%) reported using a Bausch & Lomb ReNu® brand contact lens solution or a generic brand solution manufactured by Bausch & Lomb.  These patients reported using ReNu® products from multiple product lots.

18.      As of April 9, 2006, eight of these patients (29%) had already required corneal transplantation surgery.

19.      Despite the fact that Defendant knew, and had reason to know, of these medical problems associated with and related to the use of its product as early as, at least, November, 2005, Defendant did nothing to warn the public in the United States or worldwide, or withdraw the product from shelves in the United States until mid-April, 2006.

20.      Despite the fact that Defendant knew and had reason to know of the problems associated with its products, and knew this prior to November of 2005, it did not do a full scale withdrawal of the products from the United States market until mid-May 2006.

**B.      Facts Regarding Plaintiff PAULA MINGER**

21.      Plaintiff began using Defendant's product ReNu® with MoistureLoc® in or about 2005.  Plaintiff used the product continuously through January of 2006, for its intended purpose, to clean her soft contact lenses.

22.      As a direct and proximate result of using ReNu® with MoistureLoc®, Plaintiff suffered severe and grievous personal injuries including, but not limited to, a severe fungal eye infection in her right eye, which developed in or about late January of 2006.  As a

direct and proximate result of this fungal eye infection, Plaintiff suffered severe injuries and damages, including but not limited to scarring to her eye and persistent long-term loss of visual acuity, and was forced to miss work due to excruciating pain.   Plaintiff suffered a significant wage loss as a result.

23.    Plaintiff used ReNu® with MoistureLoc® in a proper and reasonably foreseeable manner and used it in a condition that was substantially the same as the condition in which it was manufactured and sold.

24.    Plaintiff would not have used ReNu® with MoistureLoc® had Defendant properly disclosed the risks associated with the use of this product.

25.    Plaintiff would not have used, and continue to use the product had Defendant timely withdrawn it from the market.

26.    Further, had Defendant withdrawn the product when it had reason to know of the association between the product's use and the fungal keratitis outbreak, Plaintiff would never have suffered the eye infection, or suffered the consequential damages, losses, and pain and suffering.

### FIRST CLAIM FOR RELIEF
### (NEGLIGENCE AND RECKLESSNESS)

27.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

28.    Defendant owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, inspecting, packaging, marketing, advertising, distributing, and selling ReNu® with MoistureLoc®.  This duty included the duty not to introduce a product, such as ReNu® with MoistureLoc®, into the stream of commerce that caused users to suffer from unreasonably dangerous adverse side effects.

29.    At all relevant times to this action, Defendant owed a duty to properly warn Plaintiff of the risks, dangers and adverse side effects of its product ReNu® with MoistureLoc®.

30.     Defendant failed to exercise proper care in the performance of its duties, and Defendant breached its duties, by failing to exercise ordinary care in the preparation, design, research, testing, development, manufacturing, inspection, packaging, labeling, marketing, promotion, advertising, distributing, and selling of ReNu® with MoistureLoc®, including:

(a)     failing to use due care in the design, preparation, development, manufacture, inspection, and packaging of ReNu® with MoistureLoc® to prevent the aforementioned risk of injuries to individuals who used the product;

(b)     failing to conduct adequate pre-marketing testing and research to determine the safety of ReNu® with MoistureLoc®;

(c)     failing to use adequate safety, good hygiene, and adequate inspections in connection with the manufacturing of the product;

(d)     failing to use good manufacturing practices in connection with the manufacture of the product;

(e)     failing to conduct adequate post-marketing surveillance to determine the safety of ReNu® with MoistureLoc®;

(f)     failing to completely, accurately and in a timely fashion, disclose the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiff, consumers, the medical community, and the FDA;

(g)     failing to completely, accurately, and in a timely fashion, disclose the fact of the outbreak of fusarium keratitis associated with the use of the product;

(h)     failing to accompany ReNu® with MoistureLoc® with proper warnings regarding all possible adverse side effects including, but not limited to, any potential for contracting fungal infections from use of the product, associated with the use of ReNu® with MoistureLoc®;

(i)     failing to timely withdraw the product from the market as soon as Defendant knew, or had reason to know, of the outbreak of the increased incidence of patients suffering from fungal keratitis associated with this product's use;

(j)    failing to properly determine and cure the cause of the fungal transmission in its product;

(k)    being otherwise reckless, careless and/or negligent.

31.    Despite the fact that Defendant knew and had reason to know that ReNu® with MoistureLoc® caused unreasonable and dangerous side effects, which many users would be unable to remedy by any means, Defendant continued to promote and market ReNu® with MoistureLoc® to consumers, including Plaintiff.

32.    Defendant was, or should have been, in possession of evidence demonstrating that ReNu® with MoistureLoc® caused serious injuries.  Nevertheless, Defendant ignored, suppressed, and/or concealed this critical information and continued to market the product by providing false and misleading information and suppressing and concealing the truth with regard to the safety of ReNu® with MoistureLoc®.

33.    Defendant knew or should have known that consumers such as Plaintiff would foreseeably suffer injuries and losses as a result of Defendant's failure to exercise ordinary care as described above, and such injuries were foreseeable.

34.    As a direct and proximate consequence of Defendant's acts, omissions, concealment, suppression, and wrongful breaches of duties, and misrepresentations as described herein, Plaintiff sustained serious and grievous personal injuries, which have been painful and debilitating, and caused him to suffer related losses.

35.    As a direct result of Defendant's wrongful misconduct, Plaintiff required and will continue to require healthcare and services related to these injuries.  Plaintiff has incurred and will continue to incur medical and related expenses.  Plaintiff also has suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life and ability to work to her fullest extent, a diminished quality of life, diminished vision, and other losses and damages.  Plaintiff has incurred direct medical losses and costs for physician care, monitoring, treatment, medications, and medical supplies.

36.     Defendant owed a duty of reasonable care to Plaintiff to design, manufacture, test, and perform quality assurance evaluations, sell and/or distribute the ReNu contact lens solution in a safe condition.

37.     Defendant breached its duty in that it failed to exercise reasonable care and/or was reckless in the manufacture, sale, testing, quality assurance, marketing, packaging, warnings, advertising, promotion, monitoring and warning of adverse events, and/or distribution of the ReNu contact lens solution.

38.     Defendant's conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendant and deter it from similar conduct in the future.

39.     Defendant's conduct was reckless and beyond all standards of common decency so as to permit the recovery of punitive damages.

40.     By reason of the foregoing, Plaintiff was caused bodily injury, pain, suffering and economic losses.

41.     As a result of Defendant's wrongful conduct, Plaintiff is entitled to compensatory and punitive damages in a sum to be determined at trial in this matter.

**SECOND CAUSE OF ACTION**
**(STRICT PRODUCTS LIABILITY FOR DESIGN AND MANUFACTURING DEFECT)**

42.     Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

43.     Plaintiff purchased and used Defendant's ReNu® with MoistureLoc® contact lens solution product.

44.     At all times relevant to this action, Defendant was the developer, designer, manufacturer, seller, and supplier of ReNu® with MoistureLoc®, and placed the product into the stream of commerce.

45.    ReNu® with MoistureLoc® was expected to and did reach Plaintiff without substantial change in the condition in which it was manufactured and sold.

46.    ReNu® with MoistureLoc® was unsafe for normal or reasonably anticipated use; and was defective in design, formulation and manufacture, and the defects existed at the time of sale.  It contained a defect inherent to the solution itself. This defect caused it to be ineffective as a disinfectant for the cleaning and storage of contact lenses.

47.    When it left the hands of the manufacturer and supplier, it was unreasonably dangerous and more dangerous than an ordinary consumer would expect. ReNu® with MoistureLoc® was also defective and unreasonably dangerous because the foreseeable risk of injuries from ReNu® with MoistureLoc® exceeded the benefits associated with the design and/or formulation of the product.

48.    ReNu® with MoistureLoc® was defective in design or formulation because when it left the hands of Defendant manufacturer and supplier, it was unreasonably dangerous and more dangerous than an ordinary consumer would expect.

49.    ReNu® with MoistureLoc® was defective and unreasonably dangerous because the foreseeable risk of injuries from ReNu® with MoistureLoc® exceeded the benefits associated with the design and/or formulation of the product.

50.    The ReNu® with MoistureLoc® manufactured and supplied by Defendant was also defective due to inadequate warnings and inadequate reporting regarding the results of the clinical trials, testing, study, and post-marketing outbreaks of fusarium keratitis associated with the use of the product.  Defendant failed to perform adequate testing before exposing Plaintiff to the product, testing which would have shown that ReNu® with MoistureLoc® had the potential to cause serious side effects including the severe fungal eye infection that harmed Plaintiff.

51.    The ReNu® with MoistureLoc® manufactured and supplied by Defendant was defective due to inadequate post-marketing warnings or instructions because, after Defendant knew or should have known of the risk of injuries from ReNu® with

MoistureLoc®, it failed to provide adequate warnings to the medical community and consumers, to whom it was directly marketing and advertising ReNu® with MoistureLoc®; and, further, Defendant continued to affirmatively promote ReNu® with MoistureLoc® as safe and effective.

52.    ReNu® with MoistureLoc® was manufactured, inspected, packaged, distributed, tested, sold, marketed, advertised and promoted defectively by Defendant, and as a direct and proximate result of Defendant's activities in this regard, Plaintiff used ReNu® with MoistureLoc® rather than other products.  As a result, Plaintiff suffered the personal injuries described above.

53.    At all relevant times, Defendant actively promoted the use of its products directly to consumers throughout the United States and worldwide. Information provided to the consumers by Defendant on its labeling and packaging concerning the safety and efficacy of ReNu® with MoistureLoc®, especially the information contained in the advertising and promotional materials, did not accurately reflect the potential adverse side effects of ReNu® with MoistureLoc®.

54.    Defendant failed to warn Plaintiff of the dangers and defects inherent in the ordinary and expected use of the product, and failed to include adequate and accurate information on its labeling and packaging as manufactured.

55.    As a result of the product defect, the ReNu MoistureLoc solution was in a defective condition and unreasonably dangerous to Plaintiff when it left Defendant's possession, custody, or control.

56.    At all relevant times, Plaintiff used ReNu® with MoistureLoc® for the purpose and in the manner normally intended, and did not misuse the product.

57.    Defendant acted with conscious and deliberate disregard of the foreseeable harm caused by ReNu® with MoistureLoc®.  Defendant regarded its desires for profits as far more important than the safety of the consumers to whom it sold its products.

58.    Plaintiff could not, through the exercise of reasonable care, have discovered ReNu® with MoistureLoc® defects or perceived the dangers posed by the product.

59.    Plaintiff could not, by the exercise of reasonable care, have averted her injury or damages.

60.    As a direct and proximate consequence of Defendant's acts and omissions, Plaintiff sustained serious personal injuries and related losses.  Plaintiff required and will continue to require healthcare and services.  Plaintiffs have incurred and will continue to incur medical and related expenses.  Plaintiff has suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, diminished ability to work, diminished vision, and other losses and damages.  Plaintiff's direct medical losses and costs include physician care, monitoring, treatment, medications, and medical supplies.

61.    Defendant's conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

62.    By reason of the foregoing, Plaintiff was and will be caused bodily injury, pain, suffering and economic losses.  By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages in a sum to be determined at trial in this matter.

## THIRD CLAIM FOR RELIEF
## (STRICT PRODUCTS LIABILITY - FAILURE TO WARN)

63.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

64.    Defendant had a duty to warn Plaintiff of the risks and/or defects about which it knew or should have known with respect to ReNu® with MoistureLoc®.

65.    Defendant failed to adequately warn Plaintiff of the risks of the ReNu® with MoistureLoc® being used by Plaintiff.

66.    Defendant also failed to effectively warn of dangers inherent with the use of ReNu® with MoistureLoc® due to its defective design, and/or defective formulation, and Defendant's misrepresentations and inadequate fact disclosures to Plaintiff and to retailers and to medical professionals and to the general public made the product unreasonably dangerous for normal use.

67.    The ReNu® with MoistureLoc® manufactured and/or supplied by Defendant was unreasonably dangerous and defective because ReNu® with MoistureLoc® was not accompanied by proper warnings to Plaintiff regarding all possible adverse side effects associated with the use of ReNu® with MoistureLoc® and the comparative severity, incidence and duration of such adverse effects.

68.    The warnings and information given to Plaintiff did not accurately reflect the symptoms, scope, severity, or frequency of the potential side effects.

69.    After Defendant knew or should have known of the risk of injury from ReNu® with MoistureLoc®, Defendant failed to provide adequate warnings to users or consumers of the product, including Plaintiff, as well as to retailers and the medical community, failed to immediately recall or pull the product from retailers' shelves, and in fact continued to aggressively promote the product, and as a direct result thereof, ReNu® with MoistureLoc® manufactured and/or supplied by Defendant was defective due to inadequate post-marketing warning and/or instructions.

70.    Had Plaintiff been adequately warned by Defendant of the dangers of ReNu® with MoistureLoc®, she would not have used ReNu® with MoistureLoc® and would not have been damaged thereby.

71.    Had Plaintiff been adequately warned by Defendant of the dangers of ReNu® with MoistureLoc® and its defective nature, Plaintiff could have received medical care to treat her injuries in a more effective manner, and Plaintiff's physicians would have been

alerted to the problem and would have been better prepared to identify and treat infected users of ReNu® with MoistureLoc®, including Plaintiff, more effectively.

72.    By reason of the foregoing, Plaintiff was and will be caused bodily injury, pain, suffering and economic loss.

73.    Defendant acted with willful disregard for the safety of Plaintiff and regarded profits over the safety of the consumers, such as Plaintiff, to whom the product was sold for use. Defendant acted with callous disregard for the safety of Plaintiff. As a result of Defendant's willful misconduct, Plaintiff was caused to suffer the grievous personal injuries and losses described herein.

74.    As a direct and proximate consequence of Defendant's acts and omissions, Plaintiff sustained serious personal injuries and related losses. Plaintiff required and will continue to require healthcare and services. Plaintiff has incurred and will continue to incur medical and related expenses. Plaintiff has suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, diminished ability to work, diminished vision, and other losses and damages. Plaintiff's direct medical losses and costs include but are not limited to physician care, medical monitoring, treatment, medications, and medical supplies.

75.    Defendant's conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

76.    By reason of the foregoing, Plaintiff was and will be caused bodily injury, pain, suffering and economic losses.

77.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages in a sum to be determined at trial in this matter.

## FOURTH CLAIM FOR RELIEF
### (BREACH OF EXPRESS WARRANTY)

78.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

79.    Defendant expressly represented and warranted to Plaintiff and other consumers that ReNu® with MoistureLoc® was safe and fit for its intended purposes, that it was of merchantable quality, that it did not produce any dangerous side effects, particularly any unwarned-of side effects, and that it was adequately tested.

80.    These warranties came in the form of:

(a)    Defendant's public written and verbal assurances of the safety and efficacy of ReNu® with MoistureLoc®;

(b)    Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create an increased demand for ReNu® with MoistureLoc®, which failed to warn of the risk of injuries inherent to the use of ReNu® with MoistureLoc®;

(c)    Verbal and written assurances made by Defendant regarding ReNu® with MoistureLoc® and downplaying the risk of injuries associated with the product;

(d)    False and misleading written information, supplied by Defendant, upon which Plaintiff, the public, the medical community, and contact lens solution retailers relied in prescribing or recommending ReNu® with MoistureLoc® during the period of Plaintiff's use of ReNu® with MoistureLoc®, and;

(e)    direct-to-consumer advertisements.

81.    The documents referred to above were created by and at the direction of Defendant.

82.    Defendant knew or had reason to know that ReNu® with MoistureLoc® did not conform to these express warranties and representations in that ReNu® with MoistureLoc® is neither as safe nor as effective as represented, and that ReNu® with

-14-

MoistureLoc® produces serious and unwanted adverse side effects, as described above. Defendant thereby breached its express warranties and representations.

83.    These express warranties and representations by Defendant were a part of the basis of the bargain in Plaintiff's purchase from Defendant of ReNu® with MoistureLoc®.

84.    ReNu® with MoistureLoc® did not and does not conform to Defendant's express representations because it is not safe, has serious side effects, including unwarned-of side effects, and causes severe and permanent injuries.

85.    Plaintiff relied upon Defendant's express warranties. Had Plaintiff understood and appreciated how dangerous ReNu® with MoistureLoc® was, she never would have used it.

86.    ReNu® with MoistureLoc® was not fit for its intended use, it was defective at the time Plaintiff purchased it, Plaintiff used the product as it was intended to be used, Plaintiff could not have discovered the defect in the exercise of ordinary care, and the defect was a substantial factor in causing Plaintiff's injuries.

87.    As a direct and proximate consequence of Defendant's acts, omissions, misrepresentations, and breaches of warranties, Plaintiff has sustained serious personal injuries and related losses. Plaintiff required and will continue to require medical care and related services. Plaintiff has incurred and will continue to incur medical and related expenses. Plaintiff also has suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, diminished ability to work, diminished vision, and other losses and damages. Plaintiff's direct medical losses and costs include physician care, medical monitoring, treatment, medications, and medical supplies.

88.    Defendant acted with willful disregard for the safety of Plaintiff and regarded profits over the safety of consumers such as Plaintiff, to whom the product was sold for use. Defendant acted with callous disregard for the safety of Plaintiff. As a result of Defendant's willful misconduct, Plaintiff was caused to suffer the grievous personal injuries and losses described herein.

89.     As a direct and proximate consequence of Defendant's acts and omissions, Plaintiff sustained serious personal injuries and related losses.  Plaintiff required and will continue to require medical care and related services.  Plaintiff has incurred and will continue to incur medical and related expenses.  Plaintiff has suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, diminished ability to work, diminished vision, and other losses and damages.  Plaintiff's direct medical losses and costs include physician care, monitoring, treatment, medications, and medical supplies.

90.     Defendant's conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

91.     By reason of the foregoing, Plaintiff was and will be caused bodily injury, pain, suffering and economic losses.

92.     By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages in a sum to be determined at trial in this matter.

### FIFTH CLAIM FOR RELIEF
### (BREACH OF IMPLIED WARRANTY)

93.     Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

94.     Defendant manufactured, distributed, advertised, promoted, and sold ReNu® with MoistureLoc®.

95.     At all relevant times, Defendant knew of the use for which ReNu® with MoistureLoc® was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

96.     Defendant was aware that consumers, including Plaintiff, would use ReNu® with MoistureLoc® for the cleaning and storage of their soft contact lenses.

-16-

97.     Plaintiff reasonably relied upon Defendant's judgment and expertise to sell or recommend ReNu® with MoistureLoc® only if it was indeed of merchantable quality and safe and fit for its intended use.  Consumers, including Plaintiff, reasonably relied upon Defendant's implied warranty for ReNu® with MoistureLoc®.

98.     ReNu® with MoistureLoc® reached consumers, including Plaintiff, without substantial change in the condition in which it was manufactured and sold by Defendant.

99.     Defendant breached its implied warranty to consumers, including Plaintiff.  ReNu® with MoistureLoc® was not of merchantable quality or safe and fit for its intended use.

100.     ReNu® with MoistureLoc® was not fit for its intended use.  It was defective at the time Plaintiff purchased it.  Plaintiff used the product as it was intended to be used.  Plaintiff could not have discovered the defect in the product in the exercise of ordinary care.  The defect in the product was a substantial contributing factor in causing Plaintiff's injuries, damages and losses.

101.     As a direct and proximate consequence of Defendant's acts, omissions, misrepresentations, and breaches of warranties, Plaintiff has sustained serious personal injuries and related losses.  Plaintiff required and will continue to require medical care and related services.  Plaintiff has incurred and will continue to incur medical and related expenses.  Plaintiff has suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, diminished ability to work, diminished vision, and other losses and damages.  Plaintiff's direct medical losses and costs include physician care, monitoring, treatment, medications, and medical supplies.

102.     Defendant's conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers including Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

103.    By reason of the foregoing, Plaintiff is entitled to compensatory damages in a sum to be determined at trial in this matter.

## SIXTH CLAIM FOR RELIEF
### (MISREPRESENTATION AND FRAUDULENT CONCEALMENT)

104.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

105.    Defendant's superior knowledge and expertise, its relationship of trust and confidence with the public, its specific knowledge regarding the risks and dangers of ReNu® with MoistureLoc®, and its intentional dissemination of promotional and marketing information and advertisements about ReNu® with MoistureLoc® for the purpose of maximizing its sales, each gave rise to the affirmative duty to meaningfully disclose and provide all material information about ReNu® with MoistureLoc®'s risks and harms to consumers including Plaintiff.

106.    Defendant made fraudulent affirmative and material misrepresentations and omissions, as statements of fact, with respect to ReNu® with MoistureLoc® in the following particulars:

(a)    Defendant represented through its labeling, advertising, marketing materials, advertisements, and packaging that ReNu® with MoistureLoc® had been tested and was found to be safe and effective for the cleaning, disinfecting and storage of soft contact lenses;

(b)    Defendant represented in the packaging for this product that the product, "provides sustained comfort, removes protein daily, cleans, rinses, disinfects and stores," but knew, prior to November, 2005, that the product did not properly clean or disinfect contact lenses and was associated with the outbreak of fungal keratitis infections in its users;

(c)    Defendant represented in the packaging of this product that the product "disinfects", when Defendant knew or had reason to know that the representation was false and misleading, and that, in fact, the product transmits infectious fungal diseases such as fusarium keratitis to its users;

-18-

(d)    Defendant represented that ReNu® with MoistureLoc® was safer (or at least as safe) as other alternative contact lens solution products, when, indeed, it was not; and,

(e)    Defendant knew and had reason to know, prior to November, 2005, that there had been an outbreak of fusarium keratitis cases in Asia linked to use of ReNu® with MoistureLoc®, yet despite this knowledge, Defendant intentionally failed to alert consumers and the public in the United States, including Plaintiff, of this situation, suppressed and concealed this information, and intentionally continued to market the product and intentionally allowed the product to remain on the shelves for sale in the United States from November, 2005 to at least April 10, 2006.

107.    Defendant made affirmative misrepresentations and fraudulently, intentionally and/or recklessly concealed and suppressed material adverse information regarding the safety and effectiveness of ReNu® with MoistureLoc®. These statements were untrue and were known by Defendant to be untrue at the time Defendant made the statements.

108.    Defendant made these misrepresentations and actively concealed adverse information at a time when Defendant knew or had reason to know that ReNu® with MoistureLoc® had defects and was unreasonably dangerous and was not what Defendant had represented to the consuming public, including Plaintiff.

109.    Defendant omitted, suppressed and/or concealed material facts concerning the dangers and risk of injuries associated with the use of ReNu® with MoistureLoc® including, but not limited to, serious fungal eye infections which cause permanent diminishment of vision or blindness.

110.    Furthermore, Defendant's purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the serious nature of the risks associated with the use of ReNu® with MoistureLoc® in order to increase its sales to consumers such as Plaintiff.

111.    The representations and concealment were undertaken by Defendant with an intent that Plaintiff would rely upon them, as she did.

-19-

112.    Defendant's representations and concealments were undertaken with the intent of defrauding and deceiving Plaintiff to induce and encourage the sale of ReNu® with MoistureLoc®.

113.    Defendant's fraudulent representations evinced their callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers, including Plaintiff.

114.    Plaintiff justifiably relied on and was induced by Defendant's misrepresentations, omissions, and/or active concealment of the dangers of ReNu® with MoistureLoc® in selecting the ReNu® with MoistureLoc® product.

115.    Plaintiff did not know that the representations were false and misleading, and omitted critical and material information about the safety of the product, Plaintiff could not have discovered this information through ordinary means, and was entitled to and was justified in relying upon Defendant's superior skill, knowledge, representations and omissions.

116.    Had Plaintiff been aware of the increased risk of severe fungal eye infections associated with ReNu® with MoistureLoc® and the relative efficacy of ReNu® with MoistureLoc® compared with other readily available contact lens solutions, Plaintiff would not have purchased or used ReNu® with MoistureLoc®.

117.    As a direct and proximate consequence of Defendant's acts, omissions, concealment and misrepresentations, Plaintiff sustained serious personal injuries and related losses.  Plaintiff required and will continue to require medical care and related services.  Plaintiff has incurred and will continue to incur medical and related expenses.  Plaintiff has suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, diminished ability to work, diminished vision, and other losses and damages.  Plaintiff's direct medical losses and costs include physician care, monitoring, treatment, medications, and medical supplies.

118.    Defendant's conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendant and deter it from similar conduct in the future.

119.    Defendant's conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

120.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages in a sum to be determined at trial in this matter.

### SEVENTH CLAIM FOR RELIEF
### (UNJUST ENRICHMENT)

121.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

122.    At all times relevant to this action, Defendant was the manufacturer, seller, and/or supplier of ReNu® with MoistureLoc®.

123.    Plaintiff paid for ReNu® with MoistureLoc® in good faith for the purpose of using it to clean, disinfect, and store her contact lenses.

124.    Defendant has accepted payment from Plaintiff for the purchase of ReNu® with MoistureLoc®.

125.    Plaintiff did not receive the safe and effective product for which she paid and which she expected to receive from Defendant.

126.    Defendant benefited from the transaction, Defendant unjustly failed to provide the product that Plaintiff paid for and expected to receive, and this failure by Defendant was to Plaintiff's detriment and damages.

127.     It is thus inequitable and unjust for Defendant to retain this money because Plaintiff did not, in fact, receive the product Defendant represented ReNu® with MoistureLoc® to be.

128.     Defendant thus reaped a benefit bestowed by Plaintiff, at Plaintiff's expense.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1.  Compensatory damages;

2.  Disgorgement of profits;

3.  Restitution;

4.  Punitive and exemplary damages;

5.  Pre-judgment and post-judgment interest as provided by law;

6.  Recovery of Plaintiffs' costs including, but not limited to, discretionary Court costs, and those costs available under the law, as well as expert fees and attorneys' fees and expenses, and costs of this action;

7.  Recovery of all amounts by which Defendant was unjustly enriched at the expense or detriment of Plaintiffs; and,

8.  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable in this action.

Dated: August 25th, 2009

By: ___/s/ James L. Ward, Jr._____
        James L. Ward, Jr.

H. Blair Hahn, Esquire (Fed. I.D. No. 5717)
James L. Ward, Jr., Esquire (Fed. I.D. No. 6956)
RICHARDSON PATRICK
WESTBROOK & BRICKMAN, LLC
1037 Chuck Dawley Boulevard, Building A
Mt. Pleasant, SC 29464
(843) 727-6500

Elizabeth J. Cabraser (CA State Bar No. 083151)
Kent L. Klaudt (CA State Bar No. 183903)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Wendy R. Fleishman (WF 3017)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone (212) 355-9500
Facsimile (212) 355-9592

Mark Robinson
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive, 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

*Attorneys for Plaintiff*